UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LINDA J. SMITH,                    )
                                   )
               Plaintiff,          )
                                   )
          v.                       )          No.  4:07CV1329 DJS
                                   )                      (TIA)
MICHAEL ASTRUE, Commissioner       )
of Social Security,                )
                                   )
               Defendant.          )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This cause is on appeal from an adverse ruling of the Social Security Administration.  All

pretrial matters were referred to the undersigned United States Magistrate Judge pursuant to 28

U.S.C. § 636(b) for appropriate disposition.

## I.    Procedural History

On November 15, 2004, Claimant filed an application for Disability Insurance Benefits

pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq. (Tr. 63-65).[1]  In the

Disability Report Adult completed by Claimant and filed in conjunction with the application,

Claimant stated that her disability began on January 25, 2004, due to cervical spondylosis,

myopathy, and spinal arthritis.  (Tr. 86).  On initial consideration, the Social Security

Administration denied Claimant's claims for benefits.  (Tr. 51-55).  Claimant requested a hearing

before an Administrative Law Judge ("ALJ").  (Tr. 48).  On August 28, 2006, a hearing was held

---

[1]"Tr." refers to the page of the administrative record filed by Defendant with its Answer
(Docket No. 9/filed November 16, 2007).

before an ALJ. (Tr. 396-416). Claimant testified and was represented by counsel. (Id.). Vocational Expert Brenda Young, Ph.D., a certified rehabilitation counselor and a certified insurance rehabilitation specialist, also testified at the hearing. (Tr. 413-15). Thereafter, on November 9, 2006, the ALJ issued a decision denying Claimant's claims for benefits. (Tr. 8-17). After considering the contentions raised in the letter of Claimant's counsel, the Appeals Council found no basis for changing the ALJ's decision and denied Claimant's request for review of the ALJ's decision on May 22, 2007. (Tr. 3-6, 394-95).[2] The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II.    Evidence Before the ALJ

### A.  Hearing on August 28, 2006

#### 1.  Claimant's Testimony

At the hearing on August 28, 2006, Claimant testified in response to questions posed by the ALJ and counsel. (Tr. 398-413). Claimant Linda J. Smith was fifty years of age at the time of the hearing. (Tr. 398). Claimant graduated from high school and completed two years of education after high school. (Tr. 398). Claimant receives $2,140 a month for long term disability. (Tr. 399). Claimant lives in a house with her husband and her mother-in-law. (Tr. 409).

Claimant testified that she last worked as a transit service manager for Bystate (sic). (Tr. 398-99). Her job duties included managing operators, payroll, scheduling, and vacations. (Tr. 399). Claimant last worked on January 25, 2004, and worked in a sedentary capacity. (Tr. 399,

---

[2]The undersigned interprets the Appeals Council's statement that the additional evidence did not provide a basis for changing the ALJ's decision a finding that counsel's letter was not material. See Bergmann v. Apfel, 207 F.3d 1065, 1069-70 (8th Cir. 2000) (whether additional evidence meets criteria is question of law; to be material, evidence must be relevant to claimant's condition for time period for which benefits were denied, and must not merely detail after-acquired conditions or post-decision deterioration of pre-existing condition).

401).  Claimant testified that when she stopped working she had made complaints of neck pain. (Tr. 402).  Claimant's pain prevented her from sitting, and lying down was the only way she experienced any relief.  (Tr. 401).

Dr. Anthony Margherita, a rehabilitation occupational specialist on referral by Dr. Guarino, completed a residual functional capacity in June, 2006.  (Tr. 401-02).  When completing the examination, Claimant did not recall Dr. Margherita determining how long she could sit, stand, or walk.  (Tr. 413).  After the consultation, Dr. Margherita no longer treated Claimant, but she returned to Dr. Santiago for treatment.  (Tr. 402).

An MRI taken after Claimant stopped working showed she had bulging discs.  (Tr. 402). Claimant received conservative treatment including heat and manipulation therapy.  (Tr. 402). Claimant testified that pain relievers are temporary at best in providing relief.  (Tr. 403).  Dr. Santiago performed neck surgery on Claimant in either March or April 2004.  Dr. Smith, a pain specialist, diagnosed Claimant with degenerative disc disease in the neck in the spring of 2004. (Tr. 403).  An MRI dated April 2004 showed a diagnosis of osteoarthritis in Claimant's back. (Tr. 404).  Thereafter Claimant received additional rehabilitation and then injections in July, September, and October 2004.  (Tr. 404).  Claimant testified that Dr. Yi treated her and then she completed more rehabilitation at the Rehab Institute including water therapy, breathing techniques, and meditation.  (Tr. 404-05).  In April, 2005, Dr. Smith treated Claimant by administering trigger point injections, but Claimant experienced no relief.  (Tr. 405).  Dr. Guarino, her current pain management physician, started treating Claimant in April, 2005, by administering shots, but the shots provided no relief so Dr. Guarino prescribed pain medication, Avenza, a form of time-release Morphine, and muscle relaxers   (Tr. 405-06).  During an office visit with Dr.

Santiago in October, 2005, Dr. Santiago noted improvement with Claimant's neck and arm, but her neck and back pain were worse. (Tr. 406). In the beginning of 2006, Dr. Santiago noted that Claimant's neck pain had returned. (Tr. 406). At the hearing, Claimant testified that her back pain is worse than ever before and future treatment included a new test, a myelogram, scheduled the following morning.[3] (Tr. 407).

At the hearing, Claimant testified that she was uncomfortable, and asked to stand after being asked by counsel whether she would like to stand. (Tr. 408). Claimant described her constant back pain starting at her belt line through her buttocks down to her left foot. The only time Claimant experiences relief from the pressure is when she is lying down with pillows under her knees. (Tr. 408). Claimant testified that neither the stretches nor the medication completely relieves her pain. (Tr. 408-09).

The most significant problem preventing Claimant from working is her inability to sit, walk very far, or stand more than fifteen minutes because of her back and arm pain. (Tr. 400). Claimant testified that her low back pain travels from her lower back through her rear into her leg and foot. Claimant has been treated with nerve blocks and medications. (Tr. 400). Claimant had neck surgery in 2004 but still experiences pain radiating down her arm into her fingers and numbness in her fingers. (Tr. 400-01).

As to her daily activities, Claimant dresses without assistance and sometimes can use the Swifter but can never vacuum. (Tr. 409). Claimant testified that she can walk approximately a block, stand about fifteen minutes before having to get level, and sit no more than fifteen minutes.

---

[3]The undersigned notes that Claimant's counsel submitted the August 29, 2006, test results of the CT L spine, CT C spine, and myelogram on September 25, 2006, to the ALJ before he issued his decision on November 9, 2006. (Tr. 149-58).

(Tr. 411). Claimant uses the dishwasher to wash dishes. (Tr. 410). Claimant and her husband do the cooking, and her husband does the laundry. Claimant's husband does most of the shopping, but she can pick up her medications from the drugstore or a loaf of bread from the grocery store. Claimant can drive short distances of no more than fifteen minutes. (Tr. 410). Claimant testified that she can probably lift ten pounds. (Tr. 412). Lying down on the bed with pillows under her knees and a pillow under her neck is the most comfortable position for Claimant. Claimant remains in this position for an hour or two each day. (Tr. 412). Claimant used to enjoy yard work, gardening, swimming, riding a bike, horseback riding, and fishing. (Tr. 413).

## 2. Testimony of Vocational Expert

Vocational Expert Ms. Young listened to the testimony during the hearing regarding Claimant's past work experience and reviewed the exhibits admitted into evidence. (Tr. 413).

The ALJ asked Ms. Young to assume that in the first hypothetical from the State doctors as follows:

> this hypothetical Claimant, age 47 at alleged date of onset, with a high school education, plus two additional years, that she can lift and carry up to 20 pounds occasionally, 10 pounds frequently, can sit for six hours out of eight, stand or walk for six hours out of eight. Given those restrictions and those alone, could this hypothetical Claimant return to any past relevant work?

(Tr. 414). Ms. Young responded in the affirmative and opined that Claimant would be able to return to her past relevant work as a transit service manager/supervisor. (Tr. 414).

Next, in the second hypothetical from Dr. Margherita, the ALJ asked Ms. Young to assume the following:

> He's opined that this hypothetical Claimant can lift and carry between 1 to 10 pounds occasionally, 0 pounds frequently, sit for two hours out of eight, stand for two hours out of eight, walk for one hour out of eight, can never climb stairs and

ramps, ropes, ladders, and scaffolds, never balance, never stoop, never crouch, never, or I'm sorry, occasionally kneel, occasionally crawl, reaching in all directions is limited to none, reaching overhead is limited to none, fingering and fine manipulation, and handling gross manipulation is limited to occasional. Given these restrictions and those alone, could this hypothetical Claimant return to any past relevant work?

(Tr. 414-15). Ms. Young responded in the negative. (Tr. 415). Ms. Young further opined that there would not be any work in the regional or national economies this hypothetical Claimant could perform with the above-outlined restrictions. (Tr. 415). Ms. Young testified that her testimony at the hearing was consistent with the Dictionary of Occupational Title and the Selected Characteristics of Occupations. (Tr. 415).

### 3. Forms Completed by Claimant

In the Function Report-Adult, Claimant reported her daily activities to include personal care, watching television, preparing simple meals, driving to doctor or therapy appointments, light shopping, walking to the mailbox or around the yard, and talking to her mother. (Tr. 113, 115-16).

In the Pain Questionnaire dated January 10, 2005, Claimant listed Ultram, Topamax. Bextra, and Flexeril as her medications and indicated that she does experience side effects from the medications including constipation and dry mouth. (Tr. 122).

In the Adult Disability Report dated June 3, 2006, Claimant reported becoming unable to work on January 25, 2004, because of cervical spondylosis myeiopathy and spinal arthritis. (Tr. 86-87). Claimant noted that her conditions first started bothering her in 1999, but she continued to work until January 25, 2004, when she stopped working because of her condition. (Tr. 87). Claimant worked as a transit service manager from August, 1986, through January, 2004.

Claimant's job duties included dispatching, payroll, budget management, and general supervising. (Tr. 87). The job required Claimant to sit for twelve hours, to stand and walk for two hours, and to lift ten pounds frequently. (Tr. 88). Claimant supervised 200 employees. (Tr. 88).

In the Work History Report, Claimant reported working as a transit service manager from 1989 through 2004 and as a yard dispatcher from 1986 through 1989. (Tr. 141). In her job as a transit service manager, Claimant worked three twelve-hour days, and she used technical knowledge and skills, wrote reports, and completed forms. (Tr. 142). Claimant scheduled and assigned work to subordinates; scheduled random drug screening; monitored compliance with uniforms and DOT physical requirements; monitored compliance with established procedures and policies; monitored vacation schedules, overtime expenditures, attendance, and punctuality of employees; and reconciled ticket and pass sales. (Tr. 148).

## III.    Medical Records

In consultation for pain management, Dr. Stephen Smith treated Claimant on referral by Dr. Daniel Scodary on February 15, 2001. (Tr. 262). Claimant reported a one-month history of upper back and neck pain but no recollection of an initiating event. (Tr. 262). Examination revealed a decreased range of motion in her neck with maximum discomfort on lateral flexion. (Tr. 263). Palpation of Claimant's upper back and neck revealed multiple myofascial trigger points in the trapezius and rhomboids bilaterally. Dr. Smith found that Claimant has myofascial pain and the pain may be related to degenerative joint disease in her cervical spine. Based on the MRI, Dr. Smith found that Claimant does not seem to have significant spinal stenosis or spinal stenosis. Dr. Smith decided to treat Claimant with a series of trigger point injections with greater occipital nerve blocks, medications including Motrin and Elavil, and an aggressive stretching

exercise program. (Tr. 263). On February 15, 2001, Dr. Smith administered a trigger point injection. (Tr. 264).

On February 22 and March 1, 2001, Dr. Smith administered trigger point injections. (Tr. 260-61). Claimant reported good results initially and a 50% improvement after the injections. (Tr. 260-61).

On March 15, 2001, on referral by Dr. Scodary, Dr. Smith treated Claimant in consultation for pain management. (Tr. 255). Claimant reported neck pain and occipital headaches with no radicular type symptoms. The occipital nerve blocks with trigger point injections reduced Claimant's pain by 50%, but Claimant still experienced sharp neck pain. Claimant reported returning to work but her pain causing a problem for her. (Tr. 255).

During a general examination on June 26, 2003, by Dr. Timothy Jennings, a D.O., Claimant reported chronic constipation and cramps and a hematoma above her left elbow. (Tr. 367).

On January 9, 2004, Claimant returned to Dr. Jennings and complained of pain in the side of her neck. (Tr. 366). Examination revealed some tenderness in the neck. Dr. Jennings performed some manipulation to Claimant's mid thoracic area which seemed to help. (Tr. 366). In a follow-up visit on February 17, 2004, Claimant reported continued pain in her neck especially on her left side into her shoulder. (Tr. 265). Claimant reported that her therapist was wonderful, and she made some improvement, but she feels like she has reached a stale mate. Examination revealed some tenderness present at the left cervicothoracic junction with a full range of motion of her neck. Dr. Jennings referred Claimant to a pain specialist and continued Claimant's muscle relaxers and pain prescriptions. (Tr. 365). The MRI of Claimant's cervical spine on January 13,

2004, revealed degenerative changes at C5-6 with central disc bulge and mild endplate hypertrophy with encroachment on the left anterior thecal sac and mild encroachment on the left C6 foramen. (Tr. 372). Dr. Robert Gresick, the radiologist, noted that "[t]hese findings were described on the previous examination of 01/29/01 and 03/13/99." (Tr. 372-73).

On February 20, 2004, Dr. Smith treated Claimant for pain management in consultation. (Tr. 251). Claimant reported neck and arm pain on the left side for the last five years with pain becoming intolerable one month earlier and limiting her ability to function. Physical therapy did not alleviate her pain. (Tr. 251). Examination revealed range of motion of the neck decreased slightly especially with right lateral flexion and left rotation. (Tr. 252). A review of the MRI showed degenerative changes at L5-L6 with encroachment on the left C6 foramen. (Tr. 252). Dr. Smith prescribed Vicodin and administered a cervical epidural steroid injections. (Tr. 252-53). On March 3, 2004, Dr. Smith administered an epidural steroid injection. (Tr. 254).

In a letter dated March 24, 2004, Dr. Smith noted how he administered three cervical epidural steroid injections as treatment for Claimant's pain on March 10, 2004. (Tr. 249-50). Claimant reported continued neck pain and having contacted Dr. Santiago, a neurosurgeon for evaluation. Dr. Smith noted that seeking treatment from Dr. Santiago is a reasonable next step and that he has no other plans for treating Claimant. Dr. Smith opined that Claimant's neck pain is from her disc herniation and appears to be related to facet joint or myofascial pain. (Tr. 249).

On referral by Dr. Jennings, Dr. Paul Santiago evaluated Claimant during an office consultation on March 30, 2004. (Tr. 297-98, 299-300, 314-15). Claimant reported the onset of acute neck pain starting in January, 2004. (Tr. 297, 299, 314). Dr. Santiago noted that on further questioning, Claimant admitted a long history of neck pain. Claimant has a treatment

history of epidural steroid injections without any significant pain relief and no recent physical

therapy treatment. Claimant reported working on a computer exacerbates her neck pain and the

pain has prevented her from working consistently over the past several months. Examination

revealed normal range of motion on flexion-extension and rotation of neck with slight pain on

rotation towards the left and normal flexion-extension and lateral bending in the lumbosacral

spine. Dr. Santiago also noted Claimant has no pain to palpation of the cervical, thoracic, lumbar

midline, or paraspinous musculature. (Tr. 297, 299, 314). X-rays taken that day revealed mild

degenerative disc disease throughout the lumbar spine with the worst part at the C5-6 level where

the degeneration is moderate. (Tr. 298, 300, 315). The x-ray further revealed a slight

retrolisthesis at C5-6 with loss of disc height. Dr. Santiago diagnosed Claimant with cervical

spondylosis with myelopathy. After discussing the changes in the imaging studies and the results

of his physical examination with Claimant, Dr. Santiago recommended an anterior cervical

discectomy and fusion procedure. Dr. Santiago opined that such procedure should provide some

pain relief. (Tr. 298, 300, 315).

An MRI of Claimant's cervical spine on March 30, 2004, showed degenerative disc

disease at the C5-6 level. (Tr. 277). An MRI of Claimant's lumbar spine on April 5, 2004,

revealed L5-S1 bilateral facet osteoarthritis but an otherwise normal lumbar spine. (Tr. 275,

308). Dr. David Rubin, a radiologist at Barnes Hospital, completed a radiological examination on

April 8, 2004, of Claimant's cervical spine after Claimant had a discectomy at C5-6 with an

anterior interbody fusion using an anterior plate. (Tr. 274, 304, 308). Dr. Rubin found that

alignment to be normal with reduction of the previously viewed retrolisthesis at this level. (Tr.

274, 304, 308).

On April 7, 2004, Dr. Santiago admitted Claimant to Barnes Hospital to treat her cervical spondylosis with myelopa. (Tr. 283-85, 305-07). Claimant's preoperative diagnosis was C5-C6 cervical sypondylosis with myelopathy. (Tr. 292). Dr. Santiago performed a left C5-Ca6 anterior discectomy and fusion with allograft and plating and bilateral C5-C6 foraminotomies. (Tr. 292). Dr. Santiago noted no immediate complications after surgery. (Tr. 294, 296, 307).

On April 27, 2004, Dr. Louis Gilula, a radiologist at Barnes Hospital, completed a radiological study of Claimant's cervical spine after anterior cervical fusion. (Tr. 273). Dr. Gilula found the anterior cervical fusion procedure extending from C5 To C6 without evidence of failure or changes since prior study. (Tr. 273). In a follow-up visit, Claimant reported pain in her left paraspinal musculature and low back radiating down her left leg and pain increasing with any activity or sitting for long periods of time. (Tr. 313). Examination revealed 5/5 strength throughout Claimant's upper and lower extremities with normal bulk and stability and a normal range of motion to cervical flexion-extension, rotation and lateral bending with some discomfort. Dr. Santiago noted that Claimant is experiencing a moderate degree of residual aches and pains following surgery and encouraged her to give her body time to heal. Dr. Santiago refilled the Vicodin prescription and explained that he would consider physical therapy after the next check up in four to five weeks. (Tr. 313).

Dr. Santiago prescribed physical therapy as treatment for Claimant's left arm pain post surgery. (Tr. 392). Claimant would receive treatment two to three times a week for three weeks to achieve physical therapy goals. (Tr. 393). Claimant started physical therapy on June 8, 2004, and completed the therapy on July 7, 2004. (Tr. 377-91).

A comparison of the cervical spine after anterior cervical discectomy and fusion on June 4,

2004, showed the edges of the interbody bone graft had become less distinct, indicative of incorporation. (Tr. 272). Dr. Jason Oliphant further found slight improvement in pre-vertebral soft tissue swelling and alignment of the cervical spine to be normal. Dr. Oliphant also noted that there is no central canal stenosis and no peri-prosthetic seen. (Tr. 272). In a follow-up visit with Dr. Santiago, following C5-6 anterior cervical discectomy and fusion, Claimant reported feeling greatly improved. (Tr. 312). Claimant reported no longer having any neck pain with quite an extensive range of motion of her neck and overall, Claimant is "quite happy with her result thus far." (Tr. 312). Dr. Santiago prescribed six weeks of physical therapy as treatment for her residual arm and leg pain. (Tr. 312).

On July 7, 2004, Claimant returned for a follow-up visit with Dr. Santiago following the C5-6 anterior cervical discectomy and fusion with allograft and plating performed on April 7, 2004. (Tr. 311). Claimant reported that her right shoulder, arm, and hand symptoms were dramatically improved with physical therapy but she still experiences persistent low back pain. Claimant explained that her back pain is preventing her from engaging in activity and from returning to work. Dr. Santiago opined that he did not know if there was any more treatment he could offer Claimant. A review of her MRI scan of the lumbar spine revealed evidence of degenerative facet disease particularly involving the L5-S1 level bilaterally. Dr. Santiago recommended facet injections and referred Claimant to Dr. Gilula for treatment. With respect to the paperwork for long-term disability, Dr. Santiago indicated that he would make arrangements for completion of the paperwork. (Tr. 311).

The radiological comparison of Claimant's cervical spine on July 9, 2004, showed an increase in corporation of the bone graft after the anterior fusion procedure at the level of C5-6

with discectomy and mild uncovertebral joint osteoarthritis on the left at C3-4.  (Tr. 271).

In the Attending Physician's Statement of Continued Disability completed on July 12, 2004, for Hartford Life Insurance Company, Dr. Santiago noted Claimant's diagnosis to be cervical spondylosis and myelopathy.  (Tr. 286, 290).  Dr. Santiago noted that he was unable to determine the level of Claimant's impairment due to Claimant's continued discomfort.  (Tr. 287, 291).  Dr. Santiago explained that Claimant had been referred to a neurosurgeon for pain management and further evaluation and treatment.  (Tr. 287, 291).

On July 13, 2004, Dr. Santiago completed a Family and Medical Leave Act request on behalf of Claimant.  (Tr. 288).  Dr. Santiago opined that the probable duration of Claimant's condition was unknown, and she would need to be off work until released by him.  (Tr. 288).

On July 22, 2004, Dr. Gilula performed a fluoroscopically guided right L5 and L4 median branch facet nerve blocks to block Claimant's right L5-S1 facet joint as requested by Dr. Santiago.  (Tr. 269).  Dr. Gilula noted successful medial branch blocks as treatment of the right L5-S1 facet joint with prominent diminution of presenting symptoms at the end of the procedure.  (Tr. 269).

On August 16, 2004, Claimant returned to Dr. Jennings for treatment for her low back pain.  (Tr. 364).  Dr. Jennings noted that her low back pain prevented Claimant from sitting.  Dr. Jennings would not prescribe any more pain medications because another doctor had already prescribed a pain medication.  (Tr. 364).

In an initial consultation on August 25, 2004, Dr. Xiaobin Yi of the Washington University Pain Management Center evaluated Claimant on referral by Dr. Santiago for treatment of her chronic pain.  (Tr. 328).  Dr. Yi noted Claimant's history of cervical/upper back pain since

1998 secondary to degenerative disc disease at the C5-6 level status post anterior cervical discectomy and fusion in March, 2004. Claimant reported being unable to sit for a long period of time due to the unbearable pain or to walk far. The MRI of the lumbar spine on April 5, 2004, showed bilateral L5-S1 facet osteoarthritis. (Tr. 328). Examination revealed a range of motion of the cervical spine within normal range in all directions and mild tenderness at the C6-7 region. (Tr. 329). Dr. Yi noted tenderness at the L4-L5-S1 region and positive paraspinal muscle spasm in Claimant's lumbosacral spine. In his impressions, Dr. Yi found Claimant to have generalized body pain from musculoskeletal component, chronic low back pain, chronic cervical pain secondary to osteoarthritis, and L5-S1 facet osteoarthritis. (Tr. 329). As treatment, Dr. Yi prescribed Flexeril, Topamax, physical therapy including aquatherapy, and scheduled a left L5-S1 medial branch block. (Tr. 329, 337-38). Dr. Yi noted that if Claimant's cervical pain did not improve with the course of treatment prescribed, he would schedule Claimant for a cervical epidural steroid injection. (Tr. 330). Dr. Yi administered a medial branch nerve blocks to facet joints at lumbar levels L5 and S1 on the left side. (Tr. 331-36).

Claimant started physical therapy treatment at Healthsouth on September 7, 2004. (Tr. 359). In the initial plan of care, the therapist noted that Claimant would receive physical therapy treatment one to two times a week for four to six weeks. (Tr. 359). Claimant's goals included learning aquatic exercises, increasing endurance, and decreasing pain. (Tr. 354). Claimant returned for physical therapy and aquatic therapy on September 14, 2004. (Tr. 352-53). Claimant completed aquatic therapy on September 21 and 29, 2004. (Tr. 350-51). At the start of the session, Claimant reported feeling "so, so" and after the session, Claimant reported feeling well. (Tr. 350). Claimant returned for physical therapy treatment on October 6, 13, and 27,

2004, and November 3, 10, and 17, 2004. (Tr. 344-49). Claimant finished her physical therapy treatment on December 1, 2004. (Tr. 343).

On September 17, 2004, on referral by Dr. Santiago, Dr. Gilula performed a successful right median branch blocks of the L5 and L4 levels to treat the L5-S1 facet joint on the right with good relief of pain symptoms reported at the end of the procedure. (Tr. 267-68).

On October 22, 2004, on referral by Dr. Santiago, Dr. Gilula performed a successful RF ablation of the median branch of the dorsal rami of right L4 and L5 as treatment for the right L5-S1 facet joint. (Tr. 265-66).

In a follow-up visit on November 5, 2004, at the Washington University Pain Management Center, Claimant reported continuous pain in her lower back, neck, and shoulders and depression. (Tr. 326-27). Dr. Yi decreased the dosage of the Topamax prescription and prescribed Ultram. (Tr. 325).

In the Attending Physician's Statement of Continued Disability completed on November 16, 2004, for Hartford Life Insurance Company, Dr. Santiago noted Claimant's diagnosis to be cervical spondylosis and myelopathy. (Tr. 281). Dr. Santiago noted based on the MRI results, Claimant has mild central stenosis and some neuroframinal stenosis. Claimant's treatment has included facet blocks three times by a specialist in pain management. (Tr. 281). Dr. Santiago noted that he does not perform functional evaluations. (Tr. 282).

During a group therapy session on November 17, 2004, with Dr. Beverly Field, PhD, Claimant indicated how she has considered volunteering at the Humane Society. (Tr. 321).

In the Pain Management Center Follow-Up Office Note dated December 20, 2004, Dr. Yi noted that Claimant will continue her current pain medications since she experiences no side

effects and diagnosed Claimant with chronic neck and lower back pain. (Tr. 201, 318A).

Examination revealed mild tenderness in Claimant's back. (Tr. 200, 318). Claimant reported

doing a little better with some good days and some bad days and completing H2O therapy. (Tr.

197, 199, 319A). Claimant reported having some muscle spasms. (Tr. 196, 3129). Claimant

reported that lying down, applying heat, and taking medications sometimes helps improve her

pain. (Tr. 196, 319).

On January 18, 2005, Claimant reported persistent back pain. (Tr. 195). The treatment

note reads as follows:

> She has seen a neurosurgeon, a rheumatologist, and a pain doctor - all since I saw
> her last and she says that she took the work note in for disability to the pain doctor
> and he said he doesn't fill those out. She doesn't care for him anyway. He's not
> really helping her. She's on a lot of medication and has been unable to return to
> work.

(Tr. 195). Examination revealed a full range of motion of the neck and tenderness to palpation of

the lower back. Dr. Jennings noted some paravertebral pain on each side of the lumbar area. (Tr.

195). Dr. Jennings recommended that Claimant receive treatment from Dr. Steve Smith. (Tr.

194). Dr. Jennings refused to fill out Claimant's work note inasmuch as the note requests

information regarding how long Claimant can walk and bend, and he is not comfortable

completing the form, because he has not reviewed her MRI reports. Dr. Jennings recommended

that one of Claimant's specialists complete the work note. Dr. Jennings further noted that "[i]f

they won't fill them out she should get some information for me regarding how long she's been

off work and when she wants to return but she says it's been about a year. I'll fill it out best I can

if they refuse to do so." (Tr. 194). On January 27, 2005, Dr. Jennings refilled Claimant's Ultram,

Wellbutrin, Flexeril, Ambien, Topamax, and Bextra medications. (Tr. 194). On February 7,

March 3, April 5, May 3, 4, and 25, and June 3, 2005, Dr. Jennings ordered medication refills. (Tr. 193-94).

In the treatment note of February 11, 2005, Dr. Santiago explained to Claimant that he does not have a surgery for her lumbar back and does not perform insertion of pain simulators. (Tr. 310).

In the Attending Physician's Statement of Continued Disability completed on February 11, 2005, for Hartford Life Insurance Company, Dr. Santiago noted Claimant's diagnosis to be cervical spondylosis and myelopathy. (Tr. 279). Dr. Santiago noted that Claimant has had neck pain since January, 2004, and after a nerve root injection, Claimant experienced a slight decrease in pain. (Tr. 279). Dr. Santiago noted that he does not perform functional evaluations. (Tr. 280).

In the Physical Residual Functional Capacity Assessment completed on April 4, 2005, R. Manning, a disability examiner for Disability Determinations, listed degenerative disc disease as Claimant's primary diagnosis and myofascial pain as her secondary diagnosis. (Tr. 98-105). Ms. Manning indicated that Claimant can occasionally lift twenty pounds, frequently lift ten pounds, and stand and/or walk and sit about six hours in an eight-hour workday. (Tr. 99). Ms. Manning noted that Claimant has unlimited capacity to push and/or pull. With respect to postural, manipulative, and visual limitations, Ms. Manning indicated that Claimant has no limitations. (Tr. 100-01). Ms. Manning noted that Claimant has no established communicative or environmental limitations. (Tr. 102). In support, Ms. Manning noted how Claimant's statements are credible. (Tr. 103). There is no treating or examining source statement regarding Claimant's physical capacities on the record. (Tr. 104).

In a consultation examination for pain management on referral by Dr. Jennings on April 13, 2005, Dr. Stephen Smith noted that Claimant's pain is intolerable and constant with standing and sitting. (Tr. 245). Claimant reported her pain increases with sitting, standing, walking, partial forward flexion, and deflexion and decreases with heat and lying down. Examination revealed range of motion in forward flexion of 90 degrees. Extension with rotation and lumbar lordosis decreased causing Claimant the greatest degree of pain and pain with deflexion. Palpation over the lower back and gluteals revealed significant myofascial trigger points over the gluteals and piriformis bilaterally and equally. The MRI showed facet arthropathy of the lumbar spine and in the L5-S1 facets. (Tr. 245). Based on Claimant's history and physical examination, Dr. Smith found Claimant to have facet arthropathy with unclear left leg pain much worse than right. (Tr. 246). As treatment, Dr. Smith decided to perform epidural steroid injections with trigger point injections for her myofascial pain. (Tr. 246).

In the initial evaluation on April 26, 2005, Claimant reported a six year history of low back pain without a recollection of a specific event causing her back pain. (Tr. 228). Physical therapy has provided Claimant temporary relief. On referral by Dr. Santiago, Dr. Gilula performed facet injections as treatment. Dr. Yi started to treat Claimant for pain management by prescribing Wellbutrin, but because of his office location, Claimant elected to continue pain management care with Dr. Guarino. Claimant reported continuous back pain and rated the pain at a six out of ten level. (Tr. 228). Examination revealed mildly obese woman who did not exhibit pain behavior. (Tr. 229-30). Palpation of Claimant's back showed no muscle spasms of the lumbar paravertebral, no trigger points present, and no tenderness over the lumbar vertebrae. (Tr. 229). Dr. Guarino observed Claimant to have a normal gait and to be able to walk on her heels

and toes without assistance. Dr. Guarino found Claimant to have sciatica and depression and determined to perform injections in her back. If the epidurals are ineffective, Dr. Guarino noted that he would perform a discogram to help determine the reason for Claimant's pain. (Tr. 229).

In an office visit on May 3, 2005, Claimant reported sitting increases her pain and lying flat on her back helps alleviate her pain. (Tr. 225). Dr. Guarino administered a lumbar epidural steroid injection. (Tr. 239-41).

On May 24, 2005, Dr. Guarino treated Claimant's continuous low back pain in a follow-up visit. (Tr. 222). Claimant reported completing stretches at home. (Tr. 223). Dr. Guarino increased Claimant's Ambien dosage. (Tr. 224). Dr. Guarino administered a lumbar epidural steroid injection. (Tr. 236-38).

In a follow-up visit to Dr. Guarino on June 14, 2005, Claimant reported continuous low back pain. (Tr. 218-19). Claimant reported having fallen down the steps and falling on her buttocks. (Tr. 221). Dr. Guarino administered a lumbar epidural steroid injection. (Tr. 233-35).

On July 7, 2005, Clamant reported swollen glands and palpable masses along her upper arm to Dr. Jennings. (Tr. 192). Dr. Jennings found Claimant to have a possible soft tissue infection and prescribed Bactroban and Bactrim. Dr. Jennings referred Claimant to Dr. Vranich, a general surgeon, for evaluation and possible biopsy of the axillary lesions. (Tr. 192). In a follow-up visit on July 14, 2005, Claimant reported continuous low back pain. (Tr. 214). Claimant reported continued and continuous low back pain. (Tr. 207). Claimant reported that although Avinza to be the most effective medication for pain, Claimant still takes four Darvocet a day. (Tr. 209). Dr. Guarino refilled Claimant's current medications. (Tr. 210). In the treatment note, the nurse noted that Claimant will start taking Avinza the following week after surgical removal of

tumors from her left arm. (Tr. 216).

On August 1, 2005, Dr. Jennings refilled Claimant's Ambien prescription. (Tr. 192). On August 14, 16, and 31, September 26, October 24, 2005, November 21 and 28, and December 26, 2005, and January 27, 2006, Dr. Jennings agreed to Claimant's prescription refill requests and had the prescriptions refilled. (Tr. 190-91).

On September 22, 2005, Dr. Guarino treated Claimant's pain in a follow-up visit from July 14, 2005. (Tr. 209).

In an eighteen-month follow-up visit on October 21, 2005, after a C5-6 ACDF with allograft and plating on April 7, 2004, Claimant reported doing quite well. (Tr. 212). Claimant still has some soreness in her neck but her left arm symptoms have not returned. Dr. Santiago noted that Claimant is still plagued by low back and left leg pain. Dr. Guarino has tried a number of different treatment modalities with only mixed results. C-spine films revealed an evolving interbody fusion mass at C5-6 with stable hardware and alignment. Dr. Santiago diagnosed Claimant with cervical spondylosis with myelopathy. Dr. Santiago opined that he was happy with Claimant's outcome with respect to her neck, but he could not offer her any more treatment with respect to her lumbar spine. (Tr. 212).

In a follow-up visit with Dr. Guarino on January 23, 2006, Claimant reported continuous lower back pain and neck and shoulder pain and no side effects from her medications. (Tr. 203). Claimant reported that "[m]edication has helped greatly to reduce the over all pain as long as I limit my activities." (Tr. 204). Claimant's home exercise program included low back stretches.

(Tr. 204).

In a new patient wellness exam on February 21, 2006, Dr. Paul L'Ecuyer encouraged Claimant to get back into an exercise routine and to stop tobacco use. (Tr. 177-78).

In the Pain Management Center treatment note dated April 21, 2006, Claimant reported continuous pain in her lower back down her leg, neck, shoulders, and left arm. (Tr. 171). The Avinza prescription provides partial relief. (Tr. 171). Claimant's treatment plan included low back stretches. (Tr. 172). Claimant reported caring for her mother-in-law. (Tr. 173). Examination revealed pain in some areas including some intense pain. (Tr. 174). Dr. Guarino prescribed Avinza. (Tr. 174). In a follow-up visit on May 19, 2006, Claimant reported lower back pain and Avinza not helping. (Tr. 169). Claimant indicated that she planned to see Dr. Santiago for treatment of her cervical region. (Tr. 170). Dr. Guarino refilled the Avinza prescription and prescribed Zanaflex. (Tr. 170). On June 16, 2006, Claimant reported not being able to quit smoking and continued pain in her neck and shoulders. (Tr. 167). Lying down helps alleviate the pain. Claimant reported stress from taking care of mother-in-law with Alzheimers. (Tr. 167). Both Claimant's Avinza and Zanaflex prescriptions were refilled. (Tr. 168).

In the Attending Physician's Statement of Continued Disability completed on July 5, 2006, for Hartford Life Insurance Company, Dr. Anthony Margherita noted Claimant's diagnosis to be cervical post syndrome. (Tr. 160). Dr. Margherita noted that he had treated Claimant once during a consultation, and Dr. Guarino is Claimant's treating physician. (Tr. 160). Dr. Margherita determined that Claimant is limited in her ability to stand or to sit for more than thirty minutes, and to walk more than fifteen minutes. (Tr. 161). Dr. Margherita further determined that Claimant is unable to reach overhead or repetitive hand motion on a regular basis, very

limited in her ability to push or pull, and limited/unable to drive functional distances. Dr. Margherita opined that Claimant's limitations are likely to be permanent. (Tr. 161). In the Physical Capacities Evaluation, Dr. Margherita found that Claimant can sit and/or stand one to two hours at one time and walk for one hour. (Tr. 162). Dr. Margherita also determined that Claimant can occasionally lift ten pounds and never lift any weights more than ten pounds. (Tr. 162). Dr. Margherita opined in conclusion regarding Claimant's abilities and limitations as follows: This patient has a significant and severe chronic pain syndrome requiring pain management. (Tr. 163).

In a return visit to the Pain Management Center on July 14, 2006, Claimant received a refill on the Avinza prescription. (Tr. 165-66).

The lumbar spine computed tomography CT performed on August 29, 2006, showed a small focal right central disc herniation at C6-C7 without central canal or neural foraminal stenosis and minimal degenerative disc disease of the lumbar spine. (Tr. 150-52). Dr. Tammie Benzinger, a radiologist, also noted post surgical changes with anterior fusion of C5-C6 with some areas persistent lucency superiorly suggesting incomplete incorporation. (Tr. 150-52). The cervical spine computed tomography CT and the spine myelography revealed small focal right central disc herniation at C6-C7 without central canal or neural foraminal stenosis and minimal degenerative disc disease of the lumbar spine. (Tr. 153-55, 156-58). Dr. Benzinger further noted post surgical changes with anterior fusion of C5-C6 with some areas persistent lucency superiorly suggesting incomplete incorporation. (Tr. 153-55, 156-58).

## IV.    The ALJ's Decision

The ALJ found that Claimant meets the disability insured status requirements through

December 31, 2009. (Tr. 13). Claimant has not engaged in substantial gainful activity since

January 25, 2004, the date Claimant alleges she became unable to work. (Tr. 13). The ALJ

found that the medical evidence establishes that Claimant has the severe impairment of

degenerative disk disease of the cervical and lumbar spine with radiculopathy, but no impairment

or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P,

Regulations No. 4. (Tr. 14). The ALJ found that Claimant's allegations of disabling symptoms

precluding all substantial gainful activity are not entirely credible and not consistent with the

medical evidence. (Tr. 14). The ALJ found that Claimant has the residual functional capacity to

perform work that involves lifting no more than twenty pounds at a time and ten pounds

frequently, standing or walking no more than six hours, and sitting for six hours during a normal

eight-hour work day. (Tr. 14).

The ALJ determined that Claimant is able to perform her past relevant work as a transit

service manager. (Tr. 16). Claimant described her past relevant work as falling within the light

exertional capacity and requiring the ability to prepare daily reports, manage work force needs,

prepare payroll, and monitor driver assignments. The Dictionary of Occupational Titles lists the

job of a transit service manager as being performed in the light exertional capacity as it is

generally performed. The ALJ therefore determined that Claimant can perform the job's

requirements with her residual functional capacity. Likewise, the testimony of the vocational

expert was in accordance with the Dictionary of Titles' description of the job of a transit service

manager. (Tr. 16).

Based on Claimant's residual functional capacity and work experience, the ALJ opined

that Claimant is not disabled. (Tr. 16). The ALJ found Claimant is not under a disability. (Tr.

16).

## V.    Discussion

In a disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); <u>see</u> <u>also</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled.  First, the ALJ must determine whether the individual is engaged in "substantial gainful activity."  If she is, then she is not eligible for disability benefits.  20 C.F.R. § 404. 1520(b).  If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant is not found to have a severe impairment, she is not eligible for disability benefits.  If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be

conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1.      The credibility findings made by the ALJ.

2.      The claimant's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The claimant's subjective complaints relating to
        exertional and non-exertional activities and impairments.

5.      Any corroboration by third parties of the
        claimant's impairments.

6.      The testimony of vocational experts when required which
        is based upon a proper hypothetical question which sets forth the claimant's
        impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

Claimant argues that the ALJ's decision is not supported by substantial evidence on the

record as a whole, because the ALJ erred in properly formulating her residual functional capacity.

Further Claimant contends that the ALJ failed to properly assess Claimant's credibility regarding

her subjective complaints of constant pain.

A.      Residual Functional Capacity

With regard to the ALJ's determination of Claimant's RFC, the undersigned finds that the

ALJ properly assessed the medical evidence and Claimant's credibility.

Claimant relies on the opinion of Dr. Margherita made after examining Claimant to

complete a questionnaire for her insurance company.  The ALJ opined that "his opinion regarding

her exertional limitations is not consistent with the objective medical findings and the medical

record as whole."  (Tr. 16).  "The ALJ must determine a claimant's RFC based on all of the

relevant evidence."  Fredrickson v. Barnhart, 359 F.3d 972, 976 (8th Cir. 2004).  It is the

responsibility of the ALJ to assess a claimant's RFC based on all the evidence, including medical records, the opinions of treating and examining physicians, as well as the claimant's own statements regarding his limitations. McGeorge v. Barnhart, 321 F.3d 766, 768 (8th Cir. 2003); McKinney v. Apfel, 228 F.3d 860 863 (8th Cir. 2000) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)). "In analyzing the evidence, it is necessary to draw meaningful inferences and allow reasonable conclusions about the individuals's strengths and weaknesses." SSR 85-16. SSR 85-16 further delineates that "consideration should be given to ... the [q]uality of daily activities ... [and the a]bility to sustain activities, interests, and relate to others *over a period of time*" and that the "frequency, appropriateness, and independence of the activities must also be considered." SSR 85-16.

An ALJ must begin his assessment of a claimant's RFC with an evaluation of the credibility of the claimant and assessing the claimant's credibility is primarily the ALJ's function. See Anderson v. Barnhart, 344 F.3d 809, 815 (8th Cir. 2003) (finding a claimant's credibility is primarily a matter for the ALJ to decide); Pearsall, 274 F.3d at 1218. In making a credibility determination, an ALJ may discount subjective complaints if they are inconsistent with the record as a whole. Holstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001) ("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). In Polaski, the Eighth Circuit set out factors for an ALJ to consider when determining the credibility of a claimant's subjective complaints. The ALJ must consider all of the evidence presented, including the claimant's prior work record and observations by third parties and treating and examining physicians as to:

1.      the claimant's daily activities;

2.      the duration, frequency and intensity of the pain;

3.      any precipitating and aggravating factors;

4.      dosage, effectiveness and side effects of medication; and

5.      any functional restrictions.

Polaski, 739 F.2d at 1322.  The ALJ must make express credibility determinations detailing the

inconsistencies in the record that support the discrediting of the claimant's subjective complaints.

Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).  "An ALJ must do more than rely on the mere

invocation of Polaski to insure safe passage for his or her decision through the course of appellate

review."  Harris v. Shalala, 45 F.3d 1190. 1193 (8th Cir. 1995).  However, the Eighth Circuit has

held that an ALJ is not required to discuss each Polaski factor methodically.  The ALJ's analysis

will be accepted as long as the opinion reflects acknowledgment and consideration of the factors

before discounting the claimant's subjective complaints.  Lowe v. Apfel, 226 F.3d 969, 972 (8th

Cir. 2000).  See also Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996).  An ALJ is only

required to consider impairments he finds credible and supported by substantial evidence in

determining a claimant's RFC.  See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003)

("The ALJ properly limited his RFC determination to only the impairments and limitations he

found to be credible based on his evaluations of the entire record." )


        The ALJ's determination of Claimant's RFC is supported by substantial evidence in the

record.  Likewise, the ALJ noted several inconsistencies within the record, and he pointed out the

lack of supporting objective medical evidence.  The medical evidence is silent with regard to

work-related restrictions such as the length of time Claimant can sit, stand and walk, and the amount of weight she can carry. Nonetheless, the undersigned notes that it is Claimant's burden to prove at step four that she cannot perform her past relevant work. Snead v. Barnhart, 360 F.3d 834, 836 (8th Cir. 2004). The ALJ opined that "examinations performed by other physicians in the record did not indicate any clinical findings that would be expected to be present in a person with the inability to sit, stand, or walk for such a brief period of time or lack the ability to lift greater than 10 pounds." (Tr. 16). Accordingly, the ALJ found Dr. Margherita's opinion not persuasive inasmuch as his opinion was inconsistent with the medical record as a whole. A review of the medical record shows that no physician, imposed any functional restrictions of Claimant or found her to be totally disabled. Indeed, the ALJ highlighted the lack of documentation in the treatment records of restrictions upon Claimant's functional capacity ever placed on Claimant. The ALJ also properly considered the Polaski factors in concluding that Claimant's "medically determinable impairments could reasonably be expected to produce some symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 15). The ALJ listed facts from Claimant's hearing testimony regarding the Polaski factors and the medical record that reflected upon Claimant's ability to perform her past relevant work such. Further, the ALJ pointed out other inconsistencies in the record that tended to militate against Claimant's credibility. See Samons v. Astrue, 497 F.3d 813, 818 (8th Cir. 2007) (finding that substantial evidence supported the ALJ's decision where there were too many inconsistencies in the case).

Those included the absence of objective medical evidence of deterioration, and the absence of any doctor finding Claimant disabled or imposing any functional limitations. Based on the ALJ's

analysis of the medical evidence and Claimant's credibility, the undersigned finds that there exists in the record substantial evidence to support a finding that Claimant retains an RFC to perform her past relevant work. The ALJ's determination does not contradict any of the medical evidence, and nothing else in the record detracts from his decision. Based on the ALJ's analysis of the medical evidence and Claimant's credibility, the undersigned finds that there exists in the record substantial evidence to support a finding that Claimant retains a RFC to perform her past relevant work. Thus, the undersigned finds that substantial evidence supports the ALJ's finding that Claimant could lift no more than twenty pounds frequently; stand and walk no more than six hours in an eight-hour workday; sit for six hours during a normal eight-hour workday. The ALJ thus concluded that Claimant would be able to meet the physical and mental demands of her past relevant work as a transit service manager.

Claimant contends that the opinion from Dr. Margherita demonstrates that she is severely limited in her ability to sit, stand, walk, and lift. This opinion, though, is not consistent with the other medical evidence and is not from her treating physician, surgeon, or pain specialist. It should be given less weight than the opinions of Dr. Santiago who performed the cervical discectomy and fusion with allograft surgery. Indeed eighteen months after a C5-6 ACDF with allograft and plating, Claimant reported doing quite well during a follow-up visit with Dr. Santiago. Dr. Santiago opined that he was happy with Claimant's outcome with respect to her neck, but he could not offer her any more treatment with respect to her lumbar spine. Dr. Guarino provided a consistent opinion on January 23, 2006, when Claimant reported "[m]edication has helped greatly to reduce the over all pain as long as I limit my activities." (Tr. 204). *See* 20 C.F.R. § 404.1527(d)(1)-(6). The ALJ did not err in finding Dr. Margherita's

opinion regarding Claimant's functional limitations less than credible. The ALJ's credibility

determinations are supported by good reasons and substantial evidence. *See* Hamilton v Astrue,

518 F.3d 607, 613 (8th Cir. 2008); Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006)

(holding that where adequately supported credibility findings are for the ALJ to make); Gregg v.

Barnhart, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's

testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility

determination.").

The substantial evidence on the record as a whole supports the ALJ's decision. *See* Cox v.

Astrue, 495 F.3d 614, 619 (8th Cir. 2007) ("Because a claimant's RFC is a medical question, an

ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to

function in the workplace."). Where substantial evidence supports the Commissioner's decision,

the decision may not be reversed merely because substantial evidence may support a different

outcome. Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting Locher v. Sullivan, 968

F.2d 725, 727 (8th Cir. 1992)).

B.    Credibility Determination

Claimant contends that the ALJ failed to properly assess Claimant's credibility regarding

her subjective complaints of constant pain.

The determination of Claimant's credibility is for the Commissioner, and not the Court, to

decide. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). The ALJ may not discredit

Claimant's complaints of pain solely because they are unsupported by objective medical evidence.

O'Donnell v. Barnhart, 318 F.3d 811, 816 (8th Cir. 2003); Jones v. Chater, 86 F.3d 823, 826 (8th

Cir. 1996); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted).

Instead, the ALJ must fully consider all of the evidence relating to the subjective complaints, including the Claimant's work record, the absence of objective medical evidence to support the complaints, and third party observations including treating and examining doctors as to:

1.    claimant's daily activities;

2.    duration, frequency and intensity of the pain;

3.    precipitating and aggravating factors;

4.    dosage, effectiveness and side effects of medication;

5.    functional restrictions.

Ford v. Astrue, 518 F.3d 979, 982 (8th Cir. 2008) (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  The ALJ may disbelieve the claimant's subjective complaints "if there are inconsistencies in the evidence as a whole." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004).

The undersigned recognizes that pain itself may be disabling.  See Loving v. Department of Health & Human Servs., 16 F.3d 967, 970 (8th Cir. 1994).  However, "the mere fact that working may cause pain or discomfort does not mandate a finding of disability." Jones, 86 F.3d at 826.  "[T]he real issue is how severe the pain is." Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991)).  While there is no doubt that claimant experiences pain, the more important question is how severe the pain is. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001).

When determining a claimant's complaints of pain, the ALJ may disbelieve such complaints if there are inconsistencies in the evidence as a whole. Polaski, 739 F.2d at 1322. The ALJ must make express credibility determinations detailing the inconsistencies in the record that

support the discrediting of the claimant's subjective complaints. <u>Singh v. Apfel</u>, 222 F.3d 448, 452 (8th Cir. 2000); <u>see</u> <u>also</u> <u>Johnson v. Secretary of Health and Human Servs.</u>, 872 F.2d 810, 813 (8th Cir. 1989). "An ALJ must do more than rely on the mere invocation of <u>Polaski</u> to insure safe passage for his or her decision through the course of appellate review." <u>Harris v. Shalala</u>, 45 F.3d 1190, 1193 (8th Cir. 1995). Where an ALJ explicitly considers the <u>Polaski</u> factors but then discredits a claimant's complaints for good reason, his decision should be upheld. <u>Browning v. Sullivan</u>, 958 F.2d 817, 821 (8th Cir. 1992). However, the Eighth Circuit has held that an ALJ is not required to discuss each <u>Polaski</u> factor methodically. <u>Brown v. Chater</u>, 87 F.3d 963, 966 (8th Cir. 1966). The ALJ's analysis will be accepted as long as the opinion reflects acknowledgment and consideration of the factors before discounting the claimant's subjective complaints. <u>Lowe v. Apfel</u>, 226 F.3d 969, 972 (8th Cir. 2000); <u>see</u> <u>also</u> <u>Brown</u>, 87 F.3d at 966. The ALJ's credibility findings are entitled to deference if the findings are supported by multiple valid reasons. <u>See</u> <u>Goff v. Barnhart</u>, 421 F.3d 785, 791-92 (8th Cir. 2005); <u>Gregg v. Barnhart</u>, 354 F.3d 710, 714 (8th Cir. 2003) (if ALJ explicitly discredits claimant and gives good reasons for doing so, court will normally defer to credibility determination). Claimant's contention that in making his credibility determination, the ALJ failed to give weight to the fact that she did not malinger or exaggerate her symptoms is without merit. Although applicants for disability benefits have an incentive to exaggerate their symptoms, Claimant is correct that the record is devoid of any finding by a doctor that she is malingering or exaggerating her symptoms. Nonetheless, the undersigned finds that the ALJ's credibility determination is supported by substantial evidence, and thus the ALJ's alleged failure to give specific consideration to this factor does not undermine his credibility determination being supported by substantial evidence in the record as a whole.

In his decision the ALJ thoroughly discussed the medical evidence of record, the lack of ongoing medical evidence corroborating Claimant's subjective complaints of functional limitations, and the testimony adduced at the hearing. See Gray v. Apfel, 192 F.3d 799, 803-04 (8th Cir. 1999) (ALJ properly discredited claimant's subjective complaints of pain based on discrepancy between complaints and medical evidence, inconsistent statements, lack of pain medications, and extensive daily activities). The lack of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints. See Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995) (lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994) (the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints). The ALJ noted that although Claimant asserts that she is unable to work due to severe cervical spine and low back pain, the clinical and objective medical findings are inconsistent with an individual experiencing totally debilitating symptomatology. In support, the ALJ cited to the CT scan of Claimant's cervical and lumbar spine not showing any facet arthropathy, neural foraminal narrowing, or canal stenosis. Further, in Claimant's follow-up visits with Dr. Santiago, examinations revealed normal muscle strength, no sensory loss, and a normal range of motion. The ALJ found that neither Dr. Santiago nor Dr. Guarino found any muscle wasting, sensory loss, or impaired straight leg raising during examination. The CT scan of Claimant's spine on August 29, 2006, revealed "a small focal right central disc herniation at C6-C7 without central canal or neural foraminal stenosis" as well as post surgical changes. (Tr. 152). The ALJ then addressed other inconsistencies in the record to

support his conclusion that Claimant's complaints were not credible.

Specifically, the ALJ noted that no treating physician stated that Claimant was disabled or unable to work during the relevant time period. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective complaints). The lack of objective medical basis to support Claimant's subjective descriptions is an important factor the ALJ should consider when evaluating those complaints. See Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995)(lack of objective findings to support pain is strong evidence of lack of a severe impairment); Barrett v. Shalala, 38 F.3d 1019, 1022 (8th Cir. 1994)(the ALJ was entitled to find that the absence of an objective medical basis to support claimant's subjective complaints was an important factor in evaluating the credibility of her testimony and of her complaints). In addition, the ALJ noted that no physician had ever made any medically necessary restrictions, restrictions on her daily activities, or functional or physical limitations. Likewise, the medical evidence is devoid of any evidence showing that Claimant's condition has deteriorated or required aggressive medical treatment although Claimant testified otherwise at the hearing. See Id.; Ply v. Massanari, 251 F.3d 777, 779 (8th Cir. 2001) (noting a claimant's inconsistent statements as a factor to consider in determining claimant's credibility).

As demonstrated above, a review of the ALJ's decision shows the ALJ not to have denied relief solely on the lack of objective medical evidence to support her finding that Claimant is not disabled. Instead, the ALJ considered all the evidence relating to Claimant's subjective

complaints, including the various factors as required by Polaski, and determined Claimant's

allegations not to be credible. Although the ALJ did not explicitly discuss each Polaski factor in

making his credibility determination, a reading of the decision in its entirety shows the ALJ to

have acknowledged and considered the factors before discounting Claimant's subjective

complaints. See Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). Inasmuch as the ALJ

expressly considered Claimant's credibility and noted numerous inconsistencies in the record as a

whole, and the ALJ's determination is supported by substantial evidence, such determination

should not be disturbed by this Court. Id.; Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996).

Because the ALJ gave multiple valid reasons for finding Claimant's subjective complaints not

entirely credible, the undersigned defers to the ALJ's credibility findings. See Leckenby v.

Astrue, 487 F.3d 626, 632 (8th Cir. 2007) (deference given to ALJ's credibility determination

when it is supported by good reasons and substantial evidence); Guilliams v. Barnhart, 393 F.3d

798, 801(8th Cir. 2005).

The undersigned finds that the ALJ considered Claimant's subjective complaints on the

basis of the entire record before him and set out the inconsistencies detracting from Claimant's

credibility. The ALJ may disbelieve subjective complaints where there are inconsistencies on the

record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ pointed out

inconsistencies in the record that tended to militate against the Claimant's credibility. See

Guilliams, 393 F.3d at 801 (deference to ALJ's credibility determination is warranted if it is

supported by good reasons and substantial evidence). Those included Claimant's lack of

functional restrictions by any physicians, her daily activities, lack of objective medical evidence,

and the hearing testimony. The ALJ's credibility determination is supported by substantial

evidence on the record as a whole, and thus the Court is bound by the ALJ's determination. See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006); Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992). Accordingly, the ALJ did not err in discrediting Claimant's subjective complaints. See Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001) (affirming the ALJ's decision that claimant's complaints of pain were not fully credible based on findings, inter alia, that claimant's treatment was not consistent with amount of pain described at hearing, that level of pain described by claimant varied among her medical records with different physicians, and that time between doctor's visits was not indicative of severe pain). The undersigned finds that substantial evidence supports the ALJ's finding the medical records do not support the extent of Claimant's subjective complaints of pain. See Flynn v. Astrue, 513 F.3d 788, 792 (8th Cir. 2008) (standard of review; substantial evidence is enough that reasonable mind might accept it as adequate to support decision).

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. See Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007) (when ALJ explicitly discredits claimant and gives good reasons for doing so, court will normally defer to his credibility determination). Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

Therefore, for all the foregoing reasons,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be affirmed

and that Claimant's complaint be dismissed with prejudice.

The parties are advised that they have eleven days in which to file written objections to this Report and Recommendation. Failure to timely file objections may result in waiver of the right to appeal the questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

Dated this __15th__ day of July, 2008.

                                      _____/s/ Terry I. Adelman_____
                                        UNITED STATES MAGISTRATE JUDGE